0608

Frances ROBERTS, Appellant v. DUNBAR FUNERAL HOME, Respondent.

(339 S. E. (2d) 517)

Court of Appeals

*Angus F. Carter, III,* of *Oswald, Floyd & Carter,* Orangeburg, *for appellant.*

*Kay G. Crowe,* of *Barnes, Alford, Stork & Johnson,* Columbia, *for respondent.*

Heard Nov. 20, 1985.

Decided Jan. 20, 1986.

CURETON, Judge:

Appellant Frances Roberts sued respondent Dunbar Funeral Home for outrage and invasion of privacy. The trial judge granted Dunbar's motion for involuntary nonsuit as to both causes of action. Mrs. Roberts appeals. We affirm.

Although Mrs. Roberts sets forth nine exceptions in the record, each raises the issue of whether the trial judge committed error in granting Dunbar's motion for involuntary nonsuit. A tenth exception assigns error to the trial judge's striking evidence.

In reviewing the trial court's granting of the motion for involuntary nonsuit, the evidence must be viewed in the light most favorable to the appellant and if more than one reasonable inference can be drawn from the evidence, the judge's decision cannot be sustained. *Associate Management Inc. v. E. D. Sauls Construction Co.,* 279 S. C. 219, 221, 305 S. E. (2d) 236, 237 (1983); *Stanley Smith & Sons*

*v. Limestone College*, 283 S. C. 430, 432-33, 322 S. E. (2d) 474, 476 (Ct. App. 1984). Viewing the evidence in this manner, we find the facts as follows.

On the day following the death of her husband, Mrs. Roberts entered into a contract with Dunbar to provide funeral services for her husband. Mrs. Roberts initially met with Mrs. Dunbar and signed a contract for three thousand dollars ($3,000.00) with the understanding that certain other funeral arrangements would be made later. At that time, Mrs. Dunbar did not mention that collateral would be required.

Mrs. Roberts then left the funeral home and went to the cemetery to select a grave site. Mrs. Dunbar phoned her there to say she had conferred with Mr. Dunbar who decided that because no insurance was available, collateral would be required before funeral arrangements could continue. She further suggested that Mrs. Roberts pay cash, issue a check which could be held for ninety days, or consider a cheaper funeral. Mrs. Roberts immediately returned to the funeral home where she became ill. Since she had not brought a check, her sister issued a check which Mrs. Dunbar accepted.[1]

On March 4, 1982 the obituaries appeared in the local newspaper announcing the funeral for the following day. That same day Mrs. Roberts again returned to the funeral home, and was informed by Mr. Dunbar that her sister's check could not serve as collateral because it was a "three party check." He then told her that he would require other collateral before the funeral could proceed. Mrs. Roberts went home, obtained the deed to her house and titles to her automobiles. Then she returned to the funeral home only to be told by an employee that she would have to return to execute the deed before the funeral and that the execution could not be done after the funeral.

On the morning of the funeral, Mrs. Roberts accompanied by her sister and brother-in-law, went to the funeral home to execute the deed, but Mr. Dunbar was late in arriving. The sister and brother-in-law returned home to dress while

---

[1] Mrs. Roberts testified that when her sister issued the check, she informed Mrs. Dunbar that she did not have sufficient funds in the bank to cover the check.

Mrs. Roberts met with Mr. Dunbar. During this meeting, Mrs. Roberts' brother offered to issue his check for the full amount of the funeral but Mr. Dunbar refused his offer. The funeral was delayed for a short time to permit the sister and brother-in-law to return to the funeral home where the funeral services were held. Another brother paid the funeral bill the same day and the deed and automobile titles were returned to Mrs. Roberts.

Mrs. Roberts claims that these events injured her health requiring treatment by a physician for nerve disorders, headaches and a skin rash. After Mrs. Roberts presented her evidence, Dunbar moved to strike Mrs. Roberts medical bill from the record on the ground that no evidence connected it to the alleged misconduct of Dunbar. Dunbar also moved for an involuntary nonsuit as to both causes of action on the ground that the evidence was insufficient to sustain either cause of action. Without specifically addressing the motion to strike, the trial judge granted the motion for involuntary nonsuit.

## I

The tort of outrage was first given express recognition in this State in *Ford v. Hutson,* 276 S. C. 157, 276 S. E. (2d) 776 (1981). In order to recover for outrage, a plaintiff must show (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency "and must be regarded as atrocious, and utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that "no reasonable man could be expected to endure it." 276 S. C. at 162, 276 S. E. (2d) at 778.

Dunbar argues persuasively on appeal that Mrs. Roberts has failed to prove each element of the tort of outrage. We agree. The facts of this case, while showing extreme insensitivity on the part of Dunbar, nevertheless do not establish the tort of outrage. At best, they show Dunbar's hard and inflexible business posture. There

is no evidence that Dunbar intentionally or recklessly inflicted severe emotional distress upon Mrs. Roberts. In fact, the evidence does not show that the conduct of Dunbar caused Mrs. Roberts distress especially in view of the fact that the death of a loved one would ordinarily under the best of conditions cause distress. Ample evidence that her grief was caused by the death of her husband and not the conduct of Dunbar is reflected in the following testimony of Mrs. Roberts:

Q. Each time did you see the physician for what you have termed your nerve problems?
A. Yes, sir.
Q. How do you describe the nerve problems, Mrs. Roberts, in your terms instead of medical terms?
A. Well, —
Q. What was bothering you?
A. I couldn't sleep. I couldn't sleep. What was bothering me, every afternoon when I come home because I didn't realize that my husband was gone. I thought that he would be there. My child would say something to me and I would holler at him. And I knew I couldn't go on hollering at my youngun.

Mrs. Roberts also argues that the facts of this case establish a cause of action for invasion of privacy. We reject her argument. In *Meetze v. Associated Press*, 230 S. C. 330, 95 S. E. (2d) 606 (1956), the South Carolina Supreme Court defined an actionable invasion of the right of privacy as:

The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

230 S. C. at 335, 95 S. E. (2d) at 608.

Mrs. Roberts argues that Dunbar's conduct unduly intruded into her private affairs by interfering with her grieving process. Her argument is as follows: "Grieving for a deceased person is normally done in solitude and seclusion with family members and friends. . . . [I]t is

submitted that the Defendant's actions constituted a wrongful intrusion into Plaintiff's private activities, i.e., allowing Plaintiff to grieve for her husband and to be with her family and friends." Even if we were to hold that the grieving process is a protected private activity, we do not view Dunbar's conduct as wrongful or unreasonable. As stated in *Rycroft v. Gaddy:*

> When a plaintiff bases an action for invasion of privacy on "intrusion" alone, bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself therefrom.

281 S. C. 119, 124-25, 314 S. E. (2d) 39, 43 (Ct. App. 1984). Here, we discern neither a blatant or shocking disregard of Mrs. Roberts rights nor a serious mental or physical injury caused by Dunbar's actions.

Mrs. Roberts also argues that the trial court did not properly consider the evidence in considering Dunbar's motion for involuntary nonsuit. This argument has no merit. The trial court made this statement in ruling upon the evidence: "[A]pplying all the standards that I'm required to apply at the non-suit (sic) stage, that is, to give all inference (sic) [from the] evidence to the plaintiff, I'm of the opinion that a non-suit (sic) should be granted as to both causes of action."

## II

Finally, Mrs. Roberts contends that the trial court erroneously granted Dunbar's motion to strike evidence of her medical bills. There is no evidence in the record that the trial judge ever ruled on this motion. Where the record does not reflect that a point was decided in the trial court, that point will not ordinarily be considered by this court on appeal. *See Murphy v. Hagen*, 275 S. C. 334, 271 S. E. (2d) 311 (1980); *Mackey v. Kerr-McGee Chemical Corp.*, 280 S. C. 265, 312 S. E. (2d) 565 (Ct. App. 1984).

Accordingly, the order of the trial court is

Affirmed.

SANDERS, C. J., and GARDNER, J., concur.