481 S.E.2d 135

**Michael O. LEWIS, as Personal Representative of the Estate of N.G. Lewis, Deceased, Respondent,**

v.

**LOCAL 382, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (AFL–CIO), Davis Self, Larry Poole, Jerome Jenkins, Doris M. Jones, Bill Davis, John C. Davis and Ronald Goodale, Defendants,**

**of whom Local 382, International Brotherhood of Electrical Workers (AFL–CIO) is Appellant.**

No. 2573.

Court of Appeals of South Carolina.

Heard Sept. 12, 1996.

Decided Oct. 14, 1996.

Rehearing Denied Feb. 21, 1997.

414

Herbert E. Buhl, III, Columbia; and Terry R. Yellig, of Sherman, Dunn, Cohen, Leifer & Yellig, Washington, D.C., for appellant.

Henry Hammer and Howard Hammer, both of Hammer, Hammer, Carrigg & Potterfield; and Scott Elliott, Columbia, for respondent.

ANDERSON, Judge:

This is an action for an alleged violation of the South Carolina Right-to-Work Act.[1] The jury returned a verdict against Local 382 of the International Brotherhood of Electrical Workers (Local 382) in the amount of $82,560 actual damages and $25,000 punitive damages. A defense verdict was returned in favor of the other defendants. The trial court denied Local 382's post-trial motions. The union appeals. We reverse.

## FACTS/PROCEDURAL BACKGROUND

In September of 1948, N.G. Lewis joined Local 382 and remained a member until 1986. When he was initiated as a member of Local 382, Lewis signed an oath that he would abide by all of the provisions of the IBEW Constitution, its rules and laws, as well as those of Local 382. Article XXVII, Section 1, Subsection 17 of the IBEW Constitution prohibits members from "[w]orking for any ... company declared in difficulty with a [Local Union] or the I.B.E.W., in accordance with [the] Constitution."

In 1986, Lewis was employed by United Electric Company (United) as a foreman when United refused to sign a collective bargaining agreement with Local 382. Local 382 then petitioned the National Labor Relations Board to conduct a representation election among the employees of United to determine whether they wanted Local 382 to be certified as their exclusive bargaining representative. A majority of those United employees voted not to certify Local 382 as their exclusive bargaining representative.

---

1. S.C.Code Ann. §§ 41–7–10 through –90 (Rev.1986 & Supp.1995).

On April 11, 1986, Local 382's business manager, Davis S. Self, wrote a letter to United employees, including Lewis, who were members of Local 382. In the letter, Self informed the members that United had been declared "in difficulty" by the IBEW International President. Furthermore, the letter advised each Local 382 member that his membership in Local 382 could be in jeopardy if he continued his employment with United. Lewis was a member of the Executive Board of Local 382 at the time this notice was sent.

In a memo dated July 23, 1986, Lewis, citing personal and health reasons, resigned from the Executive Board of Local 382 effective July 25, 1986. Self sent Lewis a letter inviting him to attend the Union's Executive Board meeting on September 12, 1986, at which time a complaint concerning his employment by United would be discussed.

After November 1986, Lewis ceased paying his union membership dues. As a result, Lewis was dropped as a member of Local 382 and the IBEW after he failed to pay his dues for six months. According to Article XXIII, Section 4 of the IBEW Constitution, "any member indebted to his [Local Union] for six (6) months' full dues shall be dropped from membership by the [Financial Secretary]...." Furthermore, Article XXIII, Section 5 provides that "[m]embers in arrears forfeit all rights and previous standing in the I.B.E.W."

In December of 1986, Ronald Goodale, a Local 382 member, filed internal union charges against Lewis because he continued to work for United in violation of Article XXVII, Section 1, Subsection 17 of the IBEW Constitution. On December 19, 1986, pursuant to Goodale's charges, Local 382's Recording Secretary notified Lewis a hearing before the Union's trial board would be convened on January 9, 1987, at which time Lewis could answer the charges against him.

At the hearing, Lewis admitted he was working for United. He argued, however, he could not travel, due to a medical condition, to Augusta, Georgia to work for a contractor covered by the terms and conditions of a collective bargaining agreement negotiated by the IBEW Local Union in that area. The trial board agreed to delay, until it received information about the medical condition of Lewis, its decision whether Lewis had violated the IBEW Constitution by continuing to

work for United after it was declared "in difficulty." On January 19, 1987, Dr. Richard T. Alia wrote a letter advising that Lewis had been diagnosed with ulcerative proctitis in 1982, but that as of May 15, 1984, the last time Lewis was seen by Dr. Alia's late partner, the proctitis was in remission.

On February 13, 1987, the trial board again considered the charges against Lewis in light of Dr. Alia's letter. The trial board decided Lewis had violated the IBEW Constitution by continuing to work for United after it was declared "in difficulty." The board further decided to fine Lewis $2000.00, but indicated the fine would be suspended if Lewis terminated his employment by United and sought employment with a contractor who was a party to a collective bargaining agreement with Local 382 or some other IBEW Local Union.

In a letter dated February 16, 1987, the Local 382 Recording Secretary notified Lewis of the trial board's disposition of the charges against him. The letter advised Lewis the $2,000.00 fine would be suspended if he would terminate his employment with United and accept employment with a union contractor within 30 days. Self, Local 382's business manager, told Lewis he could obtain employment with a union contractor in Augusta, Georgia.

Lewis, who continued to work for United, never paid the $2,000.00 fine, nor did he appeal the trial board's decision to the IBEW Vice President who has jurisdiction over Local 382. Additionally, Local 382 never took any action to collect the fine.

In a February 8, 1988 letter, the IBEW informed Lewis he was ineligible to receive retirement benefits from the IBEW Pension Benefit Fund because he was no longer a member in good standing.[2] Article XII, Section 1(a)(1) of the IBEW Constitution sets forth the criteria for receiving retirement

---

2. The letter, which was signed by Jack F. Moore, an IBEW Trustee, in relevant part provided:

Records in this office indicate that you were an "A" member of the IBEW from September 1948 through November 1986. When you did not tender any further dues thereafter, you were dropped from membership and, as you know, when a member of the IBEW is dropped from membership, he immediately forfeits any claim to IBEW pension or death benefits as a consequence of his "A" membership in the IBEW.

benefits from the IBEW Pension Benefit Fund. That section in pertinent part provides:

Sec. 1. An "A" member who retires from the electrical trade after January 1, 1967, shall be entitled to benefits in accordance with the following rules as to eligibility:

(a)(1) *Normal Pension.* An "A" member of the I.B.E.W. in continuous good standing with twenty (20) or more years immediately preceding his application, who has attained the age of sixty-five (65) years, shall receive pension benefits computed on the basis of two dollars ($2.00) per month for each full year of such continuous "A" membership.

In May 1988, Lewis retired from United. He lost his benefits and this suit followed.

On April 18, 1989, Lewis initiated this action seeking damages for violation of the South Carolina Right-to-Work Act, S.C.Code Ann. §§ 41–7–10 through –90 (Rev.1986 & Supp. 1995). Lewis alleged the defendants, acting individually and as agents of the defendant Local 382, interfered with his right to work, and caused him to lose his pension benefits and to suffer other damages. Lewis further claimed he paid dues and made contributions to the union and its pension plan with the expectation of drawing a pension when he retired.

On May 26, 1989, the defendants filed a petition for removal in the United States District Court for the Columbia Division of South Carolina. Thereafter, Lewis petitioned for a remand to state court. On August 9, 1989, the federal court remanded the case to state court "upon the ground that removal was improvident."

The defendants moved to dismiss this action on several grounds: (1) the alleged violation of the Right-to-Work Act was preempted by § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185; (2) the alleged violation of the Right-to Work Act was preempted by § 514(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a); (3) the Right-to-Work Act did not preclude Local 382 from enforcing its membership rules against members who violated them; and (4) the prior decision of *Layne v. International Bhd. of Elec. Workers,* 271 S.C. 346, 247 S.E.2d 346 (1978), was not applicable. Although it did not rule on the defendants' motion to dismiss prior to trial, the trial court

denied the motion when it was renewed as a motion for a directed verdict at the conclusion of the presentation of Lewis' case-in-chief.

The jury returned a verdict in favor of the plaintiff[3] against Local 382 on the right-to-work claim, but not against the individual defendants remaining in the case. Further, the jury awarded Lewis $82,560.00 in actual damages and $25,000 in punitive damages against Local 382. The jury also returned verdicts on the claim of outrage[4] in favor of each of the defendants.

Local 382 immediately filed motions for judgment notwithstanding the verdict; remittitur or, in the alternative, for a partial new trial; and/or a reduction in the award of actual and punitive damages. On April 13, 1995, the trial court issued an order denying the defendants' post-trial motions, affirming the award of punitive damages, and entering final judgment against Local 382 in the amount of $82,560, plus court costs, and $25,000 in punitive damages.

## ISSUES

I. Did the trial court err in failing to dismiss the claim for violation of the South Carolina Right-to-Work Act because it is preempted by the Labor Management Relations Act?

II. Did the trial court err in failing to dismiss the claim for violation of the South Carolina Right-to-Work Act because it is preempted by the Employee Retirement Income Security Act?

III. Did the trial court err in failing to dismiss the claim for violation of the South Carolina Right-to-Work Act because the Act does not preclude unions from enforcing membership rules?

IV. Does the Court's prior decision of *Layne v. International Bhd. of Elec. Workers, supra,* apply to this action?

---

3. N.G. Lewis died on July 9, 1990. Thereafter, his son, Michael O. Lewis, was appointed personal representative of Lewis's estate and substituted as plaintiff in this action.

4. Lewis also brought an action for outrage. However, there is no appeal from the jury's verdict for the defendants on that issue.

V. Did the trial court err in failing to reduce the jury's award of actual and punitive damages?

## LMRA [5] PREEMPTION

■ Local 382 maintains the essence of Lewis's claim is that the actions of the local union deprived him of his property interest in pension benefits provided by the IBEW Pension Benefit Fund. Since interpretation of the IBEW Constitution is essential to a determination of whether Lewis had a property interest in the pension benefits, the union contends § 301 of the LMRA preempts his state law claim.

Section 301 of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties . . . .

29 U.S.C. § 185(a) (1978 & Supp.1996).

■ In *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co.*, 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962), the United States Supreme Court explained that "in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." The prospect that "individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Id.* at 103, 82 S.Ct. at 576–77. The preemptive effect of § 301 is necessary "in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988).

---

**5.** The parties refer to the preemption as § 301 of the National Labor Relations Act. In 1947, Congress enacted the Labor Management Relations Act which encapsulated the old National Labor Relations Act and added many sections.

If a state law tort claim is founded on a duty that is created by a collective bargaining agreement and without existence independent of the agreement, then it is preempted by § 301. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). "[A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 396, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987) (emphasis in original). In *Lingle, supra,* the Court stated:

> [Section] 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements.

*Lingle,* 486 U.S. at 409, 108 S.Ct. at 1883.

In discussing whether a state law claim is preempted by § 301 of the LMRA, our Supreme Court has adopted the following standard:

> The United States Supreme Court has provided a test for determining whether a state law claim is preempted by § 301 of the LMRA. This test is one of whether the state claim exists independently of the collective bargaining agreement or whether it is "inextricably intertwined" with a consideration of the terms of the agreement. If the state claim does not exist independently of the agreement, it is preempted by federal law. In determining this issue, we look to whether the tort claim intrinsically relates to the nature and existence of the agreement. Questions that relate to what the parties to a labor agreement intended and what legal consequences were intended to flow from the contract must be resolved by reference to federal law regardless of whether these questions arise in the context of an action alleging breach of contract or liability in tort. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). When assessing whether a state law remedy is "independent" of the collective bargaining agreement, we must examine whether resolution of the state

claim requires construction of the collective bargaining agreement. *Lingle v. Norge Division of Magic Chef,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). Whether a cause of action is subject to preemption depends upon the facts of the particular case and the relationship of the alleged tort to the contract must be determined on a case by case basis. *Allis–Chalmers v. Lueck, supra.* Our Court of Appeals has recognized this.

*Nash v. AT & T Nassau Metals,* 298 S.C. 428, 432, 381 S.E.2d 206, 208 (1989).

The United States Supreme Court has concluded that § 301 not only provides federal court jurisdiction over disputes involving collective bargaining agreements, but also authorizes the federal courts to fashion a body of federal law for the enforcement of such agreements. *See Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Accordingly, a preemption doctrine under § 301 has developed which was summarized in *Lingle, supra:*

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles— necessarily uniform throughout the nation—must be employed to resolve the dispute.

*Lingle,* 486 U.S. at 405–06, 108 S.Ct. at 1881.

More recently, the United States Supreme Court extended the jurisdictional reach of § 301 to union constitutions. In *Wooddell v. International Bhd. of Elec. Workers, Local 71, et al.,* 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991), the Court held § 301 confers subject matter jurisdiction upon the federal courts for suits by individual union members against their union for alleged breach of union constitutions. The Court further amplified the issue and held:

> In concluding that the employee's suit was one provided for by § 301, we observed that under a contrary holding there would be " '[t]he possibility that individual contract terms might have different meanings under state and federal law [which] would inevitably exert a disruptive influence upon

both the negotiation and administration of collective agreements.'" (citations omitted).

Similar considerations bear on this case. Congress expressly provided in § 301(a) for federal jurisdiction over contracts between an employer and a labor organization *or between labor organizations.* Collective-bargaining agreements are the principal form of contract between an employer and a labor organization. Individual union members, who are often the beneficiaries of provisions of collective-bargaining agreements, may bring suit on these contracts under § 301. Likewise, union constitutions are an important form of contract between labor organizations. Members of a collective-bargaining unit are often the beneficiaries of such interunion contracts, and when they are, they likewise may bring suit on these contracts under § 301. (emphasis in original).

If they could not, unacceptable consequences could ensue. There is no doubt that IBEW could sue under § 301 to enforce Local 71's contract with IBEW and there is no doubt that such a suit would be governed by federal law. If suit by an employee to enforce an interunion contract is not authorized by § 301 and the employee is remitted to state court and to state law, it is plain that the same contract terms might be given different meanings based solely on the identity of the party. This would exert the disruptive influence our cases have spoken of.

*Wooddell,* 502 U.S. at 101–02, 112 S.Ct. at 500.

Lewis relies on our Supreme Court's decision of *Nichols v. Amalgamated Clothing & Textile Workers Union,* 305 S.C. 323, 408 S.E.2d 237 (1991), to support his position. In that case, the Supreme Court held an action by an elected manager of a local labor union to compel payment of his salary by the parent national labor union was not preempted by the NLRA. The Court noted it needed to focus only on the union's constitution, by-laws, and prior practices to determine whether the plaintiff was entitled to payment of the wages he claimed were owed to him. However, since the Court decided *Nichols,* the United States Supreme Court issued the *Wooddell* opinion.

In light of *Wooddell, Nichols* is not precedential.

We conclude Lewis's claim under the South Carolina Right-to-Work Act is substantially dependant upon an analysis of the IBEW Constitution. Thus, it is preempted by § 301 of the LMRA. Reference to the IBEW Constitution is necessary to determine whether Lewis had acquired a property interest in pension benefits at the time of the alleged wrongful acts by Local 382. Article XII, Section 1(a)(1) of the IBEW Constitution sets forth the criteria for receiving retirement benefits from the IBEW Pension Benefit Fund. Accordingly, because interpretation of the IBEW Constitution is essential to a determination of whether Lewis had any property rights in the pension benefit fund, the state law claim under the Right-to-Work Act is preempted by § 301.

## *ERISA PREEMPTION*

Local 382 also argues the Right-to-Work claim of Lewis is preempted by § 514(a) of ERISA because it "relates to" an employee benefit plan. The union avers its alleged unlawful actions involved a benefit plan, i.e., Lewis's right to receive a pension from the IBEW Pension Benefit Fund. Accordingly, the union asserts preemption is applicable because "[a]ssuming, without conceding, that Mr. Lewis and other similarly situated former I.B.E.W. members have a property interest in pension benefits provided by the I.B.E.W. Pension Benefit Fund, I.B.E.W. Local Unions like Local No. 382 would be subject to conflicting obligations, despite the express provisions in the I.B.E.W. Constitution to the contrary." Local 382 maintains § 514(a) of ERISA was intended to preclude such conflicting obligations.

We sketch the background of this issue cognizant that readers who hunger for more detail can find it in a myriad of reported cases.

ERISA expressly provides for the preemption of "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a) (1985). The "deliberately expansive" language of the preemption clause was "designed to 'establish pension plan regulation as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S.

504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). ERISA defines "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3) (Supp.1996). ERISA further defines "employee pension benefit plan" as:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, . . . .

29 U.S.C. § 1002(2)(A)(i) (Supp.1996). Through enactment of ERISA, Congress intended "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). Congress also intended to safeguard employers' interests by " 'eliminating the threat of conflicting and inconsistent State and local regulation of employee benefit plans.' " *Id.* at 99, 103 S.Ct. at 2901.

We have recognized that while Congress intended for ERISA to preempt state laws insofar as they relate to any employee benefit plan, the preemption clause is not all encompassing. In *Medical Park OB/GYN v. Ragin,* 321 S.C. 139, 467 S.E.2d 261 (Ct.App.1996), we held:

In interpreting the scope of this preemptive language, the United States Supreme Court has held the phrase "relate to" should be given its broad, common sense meaning such that a state law "relates to" an employee benefit plan within the meaning of § 1144(a) if it has a "connection with or reference to" such a plan. As such, a state law may be subject to preemption under ERISA "even if the law is not specifically designed to affect such plans, or the effect is only indirect." (citations omitted).

*Id.* at 143–44, 467 S.E.2d at 264 (state law claims of negligent misrepresentation, breach of fiduciary duty, and professional negligence do not "relate to" an ERISA plan when the claims are asserted against parties who allegedly advised plaintiff to adopt an ERISA plan and then misrepresented and/or failed

to competently advise regarding the administration of the plan).

The IBEW Pension Benefit Fund is an "employee benefit plan" within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3) (Supp.1996). Therefore, the only question to be determined is whether Lewis's state law claim "relates to" the IBEW Pension Benefit Fund.

A state law "relates to" an ERISA-governed employee benefit plan, within the purview of ERISA's preemption clause, "if it has a connection with or reference to such a plan." *Shaw,* 463 U.S. at 97, 103 S.Ct. at 2900. Further, a state law "relates to" an ERISA plan if the rights or restrictions it creates are predicated on the existence of such a plan. *See District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992); *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Thus, the state law may be preempted even though it has no direct nexus with an ERISA plan if its effect is to dictate or restrict the choices of an ERISA plan with regard to its benefits, structure, reporting, or administration.

Lewis seeks to recover as damages from the local union the pension benefits he claims he would have been entitled to but for the action of Local 382. The resolution of this claim directly affects the pension fund as it potentially alters the criteria for receipt of benefits. In this particular case, we hold the state law claim "relates to" an employee benefit plan within the scope of ERISA's preemption clause. Accordingly, Lewis's state law claim under the Right-to-Work Act is preempted.

## *LOCAL POLICY CONCERNS*

Lewis contends his claim is not preempted by federal law because the union's conduct in this case is of merely peripheral concern to federal law and touches interests so deeply rooted in local policy and responsibility that courts should not assume that Congress intended to preempt the application of state law. Our state Supreme Court addressed this principle in *Kimbrell v. Jolog Sportswear, Inc.,* 239 S.C. 415, 123 S.E.2d 524 (1962). In *Kimbrell,* the Court held an action by employ-

ees against an employer and union to recover damages for tortious withholding of wages was not an action to regulate labor relations and was a matter in which the state had a compelling state interest. Accordingly, the claim was not preempted by federal labor law. However, the Court noted "[t]he prosecution of the present action for damages causes **no conflict with federal jurisdiction.** The National Labor Relations Act affords no remedy to plaintiffs for the wrongs done them." *Id.* at 421, 123 S.E.2d at 527 (emphasis added).

In this case, there is a direct conflict between Lewis's right-to-work claim and the LMRA and ERISA. Therefore, *Kimbrell* does not support Lewis's contention that his claim is excepted from federal preemption.

### EFFECT OF REMAND

■ Lewis argues the union is precluded from raising the preemption issue in state court after remand from the federal court. When Lewis filed his complaint in state court, the union filed a petition for removal in the federal district court asserting ERISA preempted the application of the South Carolina Right-to-Work Act. Lewis filed a motion to remand in the district court contending the action was not brought under federal law, but solely under state law for a cause of action arising out of the South Carolina Right-to-Work Act. The federal court granted the motion of Lewis to remand "upon the ground that removal was improvident."

In support of his argument, Lewis relies upon the cases of *Osteen v. Atlantic Coast Line R.R.,* 119 S.C. 438, 112 S.E. 352 (1922), and *Howell v. Hartford Accident & Indem. Co., et al.,* 160 S.C. 549, 159 S.E. 380 (1931). Those cases state the proposition that a decision by a federal court to remand a case to state court is not judicially reviewable. However, that proposition does not answer the question of whether the federal court order precludes a state court from considering preemption arguments after remand.

In *Nutter v. Monongahela Power Co.,* 4 F.3d 319 (4th Cir.1993), the Fourth Circuit Court of Appeals held a district court's findings in a remand order concerning complete preemption under ERISA and LMRA did not have a preclusive

effect and any issues decided incident to remand could be relitigated in state court. The court further enunciated:

> Federal law determines the preclusive effect of federal orders on a question of federal law, regardless of whether the court applying the federal judgment is state or federal. The most significant factor in determining the preclusive effect of a district court's findings incident to remand is the unavailability of appellate review under § 1447(d). "Under contemporary principles of collateral estoppel," the unavailability of appellate review "strongly militates against giving" a judgment preclusive effect. While the availability of appellate review is not "always an essential predicate of estoppel," we do not believe the district court's jurisdictional findings incident to remand should preclude relitigation of the same issues in state court. Accordingly, we hold that the district court's jurisdictional findings regarding complete preemption have no preclusive effect. Under our holding, any issues that the district court decided incident to remand may be relitigated in state court. (citations omitted).

*Nutter*, 4 F.3d at 321–22.

We find *Nutter* dispositive of the procedural argument of Lewis.

## *EFFICACY OF SOUTH CAROLINA RIGHT–TO–WORK ACT*

■ Additionally, Local 382 asserts the South Carolina Right-to-Work Act cannot be interpreted broadly enough to prohibit enforcement of its membership rule against union members who continue to work for employers determined to be "in difficulty."

South Carolina Code Ann. § 41–7–20 (Rev.1986 & Supp. 1995) provides:

> Any agreement or combination between any employer and any labor organization whereby persons not members of such labor organizations shall be denied the right to work for such employer or whereby such membership is made a condition of employment, or of continuance of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is

hereby declared to be against public policy, unlawful and an illegal combination or conspiracy.

South Carolina Code Ann. § 41–7–70 (Rev.1986 & Supp. 1995) provides in pertinent part as follows:

It shall be unlawful for any person, acting alone or in concert with one or more persons:

(1) By force, intimidation, violence or threats thereof,. or violent or insulting language, directed against the person or property, or any member of the family of any person (a) to interfere, or attempt to interfere, with such person in the exercise of his right to work, to pursue or engage in, any lawful vocation or business activity, to enter or leave any place of his employment, or to receive, ship or deliver materials, goods or services not prohibited by law or (b) to compel or attempt to compel any person to join, or support, or refrain from joining or supporting any labor organization.

The LMRA generally prohibits employers from discriminating against employees based on their union affiliation or activities, but § 8(a)(3) of the LMRA, 29 U.S.C. § 158(a)(3) (1973 & Supp.1996), expressly permits labor unions and employers to agree that membership in the labor union is a condition of employment, i.e., union security agreements. However, § 14(b) of the LMRA, 29 U.S.C. § 164(b) (1978 & Supp.1996), provides that, while union security agreements are permissible as a matter of federal law:

[n]othing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

■ As noted by our Supreme Court, "the evils to which the legislative intent and the remedial purpose of the statute were directed were: (1) union control of employment on the one hand; and (2) employer boycott of, or insistence upon, union labor on the other." *Branham v. Miller Elec. Co.*, 237 S.C. 540, 546, 118 S.E.2d 167, 170 (1961) (company's freedom to hire and fire employee at its pleasure is subject to the limitation that neither the hiring nor the firing may be

grounded or conditioned upon union membership or nonmembership, referral or nonreferral, approval or nonapproval).

Lewis's claim has nothing to do with compulsory unionism, the focus of § 14(b) of the LMRA. This controversy is not about any agreement between Local 382 and an employer. Rather, it is about the union's ability to enforce its internal rules against its members who joined voluntarily, and who are free to resign at any time. *See Pattern Makers' League v. National Labor Relations Board,* 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985).

Since South Carolina is a right-to-work state and employees cannot be compelled to join unions, an employee's decision to join a union and abide by its rules is voluntary. The union's purpose in requiring its members to work only for employers with whom it has a collective bargaining agreement is to be able to offer employers access to skilled workers as the benefit of signing a contract. However, even if the union obtains a contract, that agreement does not give it control over the employment pool because the union cannot compel employees working under the contract to join as a condition of employment. Therefore, Local 382's actions in this case did not violate the Right-to-Work Act because Lewis's claim does not involve compulsory unionism.

### LAYNE v. INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 382

■ In *Layne v. International Bhd. of Elec. Workers, Local 382,* 271 S.C. 346, 247 S.E.2d 346 (1978), the Supreme Court affirmed the trial court's denial of the local union's demurrer to the complaint in a Right-to-Work claim. Layne, a union member for over thirty-five years, alleged he paid dues with the expectation of drawing a pension upon his retirement. He further alleged the union expelled him from membership because he was working on a construction project with non-union members. Layne averred the union's action was a violation of the South Carolina Right-to-Work Act and, as a result, he suffered damages " 'in that he lost the benefit of monies paid to Defendants over thirty-five years.' " *Id.* at 348–49, 247 S.E.2d at 348. On appeal, the union argued the complaint failed to state a cause of action because the conduct

complained of did not constitute a violation of the Right-to-Work Act. The Supreme Court disagreed and held:

> [T]he attempt to coerce the plaintiff from engaging in the particular employment by means of threatening his expected retirement benefits constitutes a tortious violation of the Right to Work Act.
>
> . . . .
>
> Applying [Section 41–7–70] to the facts alleged in the complaint, it can reasonably be said that the union's actions constituted coercion and intimidation directed against the plaintiff and his property which was designed to effect compulsory support of the union and accomplish union control of the plaintiff's employment.

*Layne,* 271 S.C. at 350, 247 S.E.2d at 348.

Based upon the facts of this case, we conclude *Layne* is distinguishable. *Layne* was decided on a demurrer and the Court considered the factual allegations to be admitted. *Id.* In that respect, the Court considered as admitted the fact that Layne had a property interest in his expected pension benefit.

In contrast to *Layne,* this case was tried on its facts and the record is devoid of any evidence establishing that, at the time he was disciplined, Lewis had any vested right to future pension benefits from the IBEW. Rather, the evidence demonstrated Lewis had a contract with the union which would entitle him to pension benefits in the future *if* he fulfilled certain conditions set forth in the IBEW Constitution. The conditions could not be satisfied until the member became eligible to apply for the pension benefit. Therefore, the benefit could not vest and the member would not obtain any property right in the benefits. Because Lewis did not satisfy the required conditions, he never acquired a property interest in the IBEW Pension Benefit Fund. As a result, we conclude there is no evidence of a "threat against property" and the *Layne* case is not controlling.

## CONCLUSION

Based upon the above analysis, we conclude Lewis's action for an alleged violation of the South Carolina Right-to-Work Act is preempted by both LMRA and ERISA. The trial court erred in denying the union's trial and post-trial motions.

Accordingly, the decision of the trial court is reversed and the case is remanded for a dismissal due to a lack of subject matter jurisdiction.

**REVERSED AND REMANDED.**[6]

GOOLSBY, J., concurs.

CURETON, J., dissents in a separate opinion.

CURETON, Judge (dissenting):

I respectfully dissent from the majority's holding and conclude that neither the LMRA nor ERISA preempts Lewis's cause of action. I also would hold that Lewis's allegations properly state a cause of action under South Carolina's Right to Work Act, S.C.Code Ann. § 41–7–10 *et. seq.* (1986).

## I.  LMRA PREEMPTION

Section 301 of the LMRA is the provision authorizing actions based on contracts between employers, unions, local unions, and employees. In order for an action to fall within the purview of § 301, it must either be: (1) an action for violations of a contract between an employer and a labor organization which represents employees in an industry affecting commerce, or (2) an action for violations of a contract between such labor organizations. *Wooddell v. Int'l Bhd. of Elec. Workers,* 502 U.S. 93, 98, 112 S.Ct. 494, 498, 116 L.Ed.2d 419 (1991). Admittedly, the reach of § 301 preemption is broad. Because of concern about conflicting interpretations of labor-oriented contracts, § 301 preempts state law claims if "the resolution of the state law claim depends upon the meaning of a collective bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–6, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988). *See also Hayden v. Reickerd,* 957 F.2d 1506 (9th Cir.1992) (noting that preemption is appropriate only when provisions of a § 301 contract must be interpreted). The proper test for § 301 preemption asks:

> ... whether the [state-law cause of action] confers nonnegotiable state-law rights on employers or employees indepen-

---

6. Due to our disposition of the preceding issues, we find it unnecessary to consider the last issue stated by the union.

dent of any right established by contract, or, instead, whether evaluation of the [state law] claim is inextricably intertwined with consideration of the terms of the labor contract. If the state tort law attempts to define the meaning of the contract relationship, that law is preempted. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985), *cited in Nash v. AT & T Nassau Metals,* 298 S.C. 428, 381 S.E.2d 206 (1989). However, "not every dispute concerning employment, or tangentially involving a provision of the collective bargaining agreement, is pre-empted by § 301 or other provisions of federal labor law." *Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911. The United States Supreme Court also has held that union constitutions are contracts between labor organizations under § 301, so the above stated preemption rules apply to interpretation of union constitutions as well as interpretation of collective bargaining agreements. *Cf. Wooddell,* 502 U.S. at 98–101, 112 S.Ct. at 498–500 (holding that a union member may sue a local union for violation of the national union's constitution);[1] *United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus. v. Local 334,* 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981) (extending the jurisdictional reach of § 301 to union constitutions).

However, Lewis's claim that the local union's actions violated the South Carolina Right to Work Act does not present a case which falls under the admittedly broad preemption doctrine pursuant to § 301. First, the right to work statute cannot be superseded by agreement; the rights created therein are non-negotiable and thus meet that portion of the *Lueck* test. *See* S.C.Code Ann. § 41–7–10 *et. seq.* (1986) (stating that violations of the statute are against the public policy of South Carolina). Second, Lewis does not allege any sort of claim that the local union violated the IBEW constitution. Thus, Lewis's claim is not based directly on rights created by the union constitution; instead, it is based on rights created by South Carolina's right to work law. Third, Lewis's claim does not depend on any sort of interpretation of the union constitution. The record does not reflect any dispute among the

---

1. I agree with the majority that *Wooddell* would change the result in *Nichols v. Amalgamated Clothing and Textile Workers Union,* 305 S.C. 323, 408 S.E.2d 237 (1991).

parties at trial as to the only issues that could possibly involve interpretation of the union's constitution: (1) whether United Electrical was properly determined to be in difficulty, (2) whether Lewis was fined and suspended in accordance with the union's rules and constitution, and (3) whether Lewis eventually would have been entitled to pension benefits but for his membership lapse.[2] Thus, § 301 preemption is not applicable.

The majority contends that § 301 preempts Lewis's action because the union's constitution must be interpreted to determine whether Lewis had a property interest in pension benefits at the time of the union's alleged wrongful actions. However, the pension benefits are only referred to in this action as a measure of Lewis's damages, and it is undisputed that Lewis, had he continued his membership of 38 years, would have been entitled to benefits upon his retirement but for the actions by the local union. Moreover, whether Lewis had a property interest in the pension benefits is irrelevant to the use of his expectancy in the benefits as a yardstick to measure his damages. Lewis does not have to show a property interest in the pension benefits in order to claim the loss of them as the measure of damages.[3] *See Midgett v. Sackett–Chicago, Inc.*, 105 Ill.2d 143, 85 Ill.Dec. 475, 480, 473 N.E.2d 1280, 1285 (1984), *cert. denied*, 474 U.S. 909, 106 S.Ct. 278, 88 L.Ed.2d 243 (1985) (holding that a plaintiff may claim loss of unvested pension benefits as a element of damages in a workers' compensation retaliatory discharge case). *See also* 22 Am. Jur.2d *Damages* § 115 (1988). In any event, mere reference

---

**2.** There was testimony at trial about the proper procedure for putting an employer "in difficulty" with the union. However, the record reflects no conflicting testimony about whether the union properly put Lewis's employer "in difficulty."

**3.** The majority distinguishes *Layne v. International Bhd. of Elec. Workers, Local 382*, 271 S.C. 346, 247 S.E.2d 346 (1978), because *Layne* involved a demurrer which required the court to accept the allegations in the pleadings as true. However, since I would hold that Lewis did not need to prove his pension benefits had vested in order to claim them as a measure of damages, I would further hold that *Layne* is applicable and binding. In any event, the *Layne* opinion is unclear as to whether Layne's benefits had vested, and the court referred to the "plaintiff's *expectancy* of retirement benefits." *Id.* at 350, 247 S.E.2d at 348 (emphasis added). Moreover, Lewis argues there are other elements of the damages award, i.e. emotional distress, humiliation, etc.

to or consideration of the terms of a union constitution is not the equivalent of interpreting the meaning of the terms. *Ramirez v. Fox Television Station, Inc.*, 998 F.2d 743, 749 (9th Cir.1993) (holding that the provisions relating to promotion in a collective bargaining agreement did not require preemption of an action based on discrimination in promotion). Thus, Lewis's right to work action does not require an interpretation of the terms of the union constitution. I would hold that § 301 of the LMRA does not preempt Lewis's claim. *Cf. Baldwin v. Pirelli Armstrong Tire Corp.*, 927 F.Supp. 1046 (M.D.Tenn.1996) (holding that for purposes of removal, § 301 does not completely preempt a retaliatory discharge claim based on the Tennessee right to work statute).

## II.  ERISA PREEMPTION

I would also hold that ERISA does not preempt Lewis's right to work claim. Congress expressly enacted a provision which preempts any state cause of action which "relate[s] to" an employee benefit plan, and the United States Supreme Court has held that the "relate to" phrase should be given a broad, common sense meaning as "connection with or reference to." 29 U.S.C. § 1144(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). However, the United States Supreme Court recently held that "relate to" cannot "extend to the furthest stretch of its indeterminacy," and that a court should "look instead to the objectives of the ERISA statute as a guide to the scope of state law that Congress understood would survive." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995), *cited in Medical Park OB/GYN v. Ragin*, 321 S.C. 139, 467 S.E.2d 261 (Ct.App.1996). Congress intended ERISA to set the standards of conduct, responsibilities, and obligations for plan fiduciaries. 29 U.S.C. § 1001(b). Congress further intended the preemption clause to "avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Travelers*, 514 U.S. at 657, 115 S.Ct. at 1677–78.

In interpreting the ERISA preemption statute, a number of courts have applied these standards to hold that mere reference to pension benefits as a measure of damages is not

enough for a state cause of action to "relate to" the employee benefit plan. In *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116 (4th Cir.1989), employees sued their employer for terminating them after the employer allegedly represented that it would not fire any employee before the age necessary to avoid an early retirement penalty. The *Pizlo* court held that ERISA did not preempt the employees' claims for breach of contract, promissory estoppel, and negligent misrepresentation. In doing so, the court stated:

> The claims here would not submit [the employer] to "conflicting employer obligations and variable standards of recovery", "determine whether any benefits are paid" nor "directly affect the administration of benefits under the plan." The claims do not bring into question whether Plaintiffs are eligible for plan benefits, but whether they were wrongfully terminated from employment after an alleged oral contract of employment for a term. In their state law claims, the Plaintiffs seek from the corporation compensatory damages for wages and pension, health, life and disability benefits that they would have been entitled to had the alleged contract to work until age 62 not been breached. If the Plaintiffs prevail, the damages would be measured in part by the lost pension benefits the Plaintiffs would have received, but the pension trust itself would not be liable and the administrators of the pension plan would not be burdened in any way.

*Pizlo*, 884 F.2d at 120–21 (citations omitted). In *Hospice of Metro Denver, Inc. v. Group Health Ins. of Oklahoma, Inc.*, 944 F.2d 752 (10th Cir.1991), a hospice sued an insurer on a promissory estoppel theory because the insurer refused to pay a claim after repeatedly assuring the hospice that payment would be forthcoming. Similarly, the *Hospice* court held that ERISA does not preempt the hospice's cause of action. In doing so, the *Hospice* court stated:

> Hospice has not alleged any conduct on the part of [the insurer] which relates to the administration of the plan, to the processing of any covered claim, or which impinges on any employee's ERISA rights.... [M]erely because [Hospice's] damages would be based upon the amount of potential plan benefits does not implicate the administration of the plan, and is not consequential enough to connect the

action with, or relate the action to, the plan. The payment of the judgment would be a one time, lump-sum amount and would not further burden the plan, either financially or administratively.... An action brought by a health care provider to recover promised payment from an insurance carrier is distinct from an action brought by a plan participant against the insurer seeking recovery of benefits *due under the terms of the insurance plan.* Preemption in this case would stretch the "connected with or related to" standard too far. Therefore, we hold that Hospice's action is not preempted by ERISA.

*Hospice,* 944 F.2d at 755–56 (emphasis added) (citations omitted).[4] Admittedly, *Hospice* does not involve suit by former beneficiaries of a ERISA plan, but *Pizlo* does. Both cases hold unequivocally that ERISA does not preempt state causes of action merely because damages are measured by lost benefits. *See also Howard v. Indiana Michigan Power Co.,* 812 F.Supp. 135 (S.D.Ind.1992) (finding no ERISA preemption when the pension benefits relate to damages, not liability); *Schlenz v. United Airlines, Inc.,* 678 F.Supp. 230 (N.D.Cal. 1988) (holding that ERISA does not preempt a wrongful discharge claim because the damage award, which is based partly on lost employee benefits, will be nothing more than a one-time lump-sum payment triggered by employer's conduct); *Totton v. New York Life Ins. Co.,* 685 F.Supp. 27 (D.Conn. 1987) (ruling that ERISA does not preempt claim for breach of an employment contract even though lost pension benefits are sought as damages, in part because the plan will not pay the one-time lump-sum judgment). *Cf. Morstein v. National Ins. Serv., Inc.,* 93 F.3d 715 (11th Cir.1996) (en banc) (holding that ERISA does not preempt a company president's suit

---

**4.** In *Baker Hospital v. Isaac,* 301 S.C. 248, 391 S.E.2d 549 (1990), the South Carolina Supreme Court held that ERISA preempted a hospital's contract, promissory estoppel, negligence, and misrepresentation claims. Like *Hospice,* the hospital sued after the insurer promised that a patient was covered, and then the insurer refused to pay. *Id.* However, *Isaac* 's finding of preemption was based on stipulations by the parties at oral argument that ERISA preempted the common-law causes of action. *Id.* *Isaac* also noted that it followed the "clear majority rule." *Id.* In this case, however, the parties disputed preemption. This case also occurs after the trend to narrow ERISA preemption in *Hospice, Travelers,* and the other authorities cited. Therefore, I do not think that *Isaac* changes the reasoning in this dissent.

against an insurance agent for fraudulently and negligently inducing her to purchase a replacement policy with a pre-existing condition clause); *Custer v. Sweeney*, 89 F.3d 1156 (4th Cir.1996) (holding that ERISA does not preempt a legal malpractice claim against an attorney concerning his represen-tation of an employee benefit plan because the claim does not affect "the structure, the administration, or the type of bene-fits provided by the ERISA plan").[5]

In this case, Lewis's claim involves none of the ERISA concerns, and his claim clearly falls within the persuasive holdings in *Pizlo, Hospice,* and the myriad of federal district court cases. Lewis's action does not raise the potentiality of conflicting regulation of an ERISA plan. Lewis does not attempt to subject the plan or its administrator to any liability, and he does not allege any conduct "which relates to the administration of the plan, to the processing of any covered claim, or which impinges on [his] ERISA rights." *Hospice,* 944 F.2d at 755. He does not claim that, pursuant to the plan, he is a beneficiary who was unfairly prevented from claiming his benefits. Instead, Lewis claims that Local 382 of the

---

5. In *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the United States Supreme Court held that ERISA preempted an employee's claim that, four months before his benefits vested, his employer fired him with the express purpose to avoid "contributing to or paying [employee] benefits." However, *Ingersoll–Rand* is distinguishable from the present case. In *Ingersoll–Rand*, the preempted claim was that the employer's principal reason for termi-nation was to prevent vesting of benefits. The Supreme Court held the claim was preempted partly because an action pursuant to ERISA § 510 already exists for "interfering with [the] attainment of any right ... under the plan." *Ingersoll–Rand*, 498 U.S. at 142–43, 111 S.Ct. at 485. However, Lewis does not allege that the union's activities were for the express purpose of preventing him from claiming his benefits; thus, his action does not fall within either the *Ingersoll–Rand* rule or ERISA § 510. *See Howard v. Indiana Michigan Power Co.*, 812 F.Supp. 135, 137–38 (S.D.Ind.1992); *Tippett v. Old Kent Bank*, 134 F.R.D. 159, 160–61 (W.D.Mich.1991) (both cases distinguishing *Ingersoll–Rand* on this basis, in employee claims for lost pension benefits as damages). Unlike *Ingersoll–Rand*, the court's inquiry in this case does not have to be directed toward the plan as to whether the union had a legitimate or pension-defeating motive. Finally, *Ingersoll–Rand* was decided before the Supreme Court's narrowing of ERISA preemption in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). After *Travelers,* I do not think the Supreme Court would extend *Ingersoll–Rand* to the present situation.

IBEW unlawfully attempted to prevent him from working for United Electrical, Inc., and that, *merely as a result,* Lewis lost his membership and pension benefits. Lewis does not deny that he is no longer a beneficiary under the terms of the union's pension plan. Thus, there is a distinction between one who claims as an actual beneficiary under an employee benefit plan, and one who claims as a nonbeneficiary "whose damages might be measured by the plan's formula." *Howard,* 812 F.Supp. at 137. Moreover, these damages will be paid by the local union in a one-time lump-sum payment, and not by the plan in pension-style monthly installments. For the foregoing reasons, I would hold that Lewis's right to work claim is not preempted by ERISA.

## III. RIGHT TO WORK ACT

The majority holds that the right to work act cannot be interpreted broadly enough to encompass Lewis's claim. I disagree pursuant to the South Carolina Supreme Court's precedent in *Layne v. International Bhd. of Elec. Workers, Local 382,* 271 S.C. 346, 247 S.E.2d 346 (1978). *Layne* involved an extraordinarily similar factual situation in which a former union member claimed he lost "the benefit of monies paid [the union] over thirty-five years" because the union expelled him for working on a job with non-union members.[6] *Layne* clearly held that Layne stated a cause of action pursuant to the right to work act. *Id.* Admittedly, *Layne* held that the tortious violation was the "attempt to coerce the plaintiff from engaging in the particular employment by means of threatening his expected retirement benefits."[7] *Id.* at 350,

---

6. The *Layne* court interpreted Layne's claim of damage as "inferentially the loss of the expectancy of drawing retirement benefits...." *Layne,* 271 S.C. at 349, 247 S.E.2d at 348.

7. As noted before, termination of an employee or union member for the express purpose of preventing the vesting of benefits might be preempted under *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). However, there is an obvious difference between the *Ingersoll–Rand*-type situation of a primary motive to terminate someone in order to prevent vesting, and the *Layne*-type situation of attempting to use pension benefits as leverage in order to achieve compliance with union rules or decisions. The former situation involves an economic decision to avoid ultimately having to pay benefits by firing shortly before vesting; however, in the latter situation

247 S.E.2d at 348. However, even if *Layne* is read as suggested by the majority, and even if Lewis did not have a vested interest in the pension benefits, there was certainly "intimidation . . . directed against [Lewis's] person or property" in the union's actions and fine of $2,000 levied against him. S.C.Code Ann. § 41–7–70 (1986). In any event, *Layne* does not hold that a threatening of vested benefits is necessary in order for a plaintiff to state a right to work tort; in fact, the court refers to Layne's "expectancy of retirement benefits." *Layne*, 271 S.C. at 350, 247 S.E.2d at 348. Therefore, I would hold that *Layne* clearly supports Lewis's cause of action pursuant to the right to work act.

## IV. CONCLUSION

I would hold that neither the LMRA nor ERISA preempts Lewis's claim. I would further hold that Lewis stated a cause of action pursuant to the South Carolina Right to Work Act. Thus, I would affirm the jury's verdict against the local union.

the union or employer ordinarily would not care if a compliant beneficiary obtained his benefits. Therefore, even *Layne* 's statement of that case's tort is not preempted.